THIS DOCUMENT IS <u>NOT</u> IN PROPER FORM ACCORDING
TO FEDERAL AND/OR LOCAL RULES AND PRACTICES
AND IS SUBJECT TO REJECTION BY THE COURT.

REFERENCE *CJVU 54*
(Rule Number/Section)

Diamond Age Corp.
1215 S. Kihei Rd. Ste O# 339,
KIHEI, HAWAII 96753
Telephone: 808-359-7789
Jake Ganor
President, Diamond Age.
Jakeganor@gmail.com
*Pro Se on Behalf of Defendant*

FILED _____ LODGED
RECEIVED _____ COPY

MAY 2 5 2021

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

Armored Republic, LLC d/b/a AR500 Armor, an Arizona limited liability company,

Plaintiff,

v.

Diamond Age Corp., a Delaware corporation,

Defendant.

NO. 2:20-cv-01366-DLR

**MOTION TO STAY PROCEEDINGS PENDING RESOLUTION OF A WRIT OF MANDAMUS**

Defendant Diamond Age Corp., in the above-captioned action by Armored Republic, LLC d/b/a AR500 Armor, hereby respectfully requests that the Court stay proceedings pending resolution of a petition for writ of mandamus to the United States Court of Appeals for the Ninth Circuit.

This motion is made based on Federal Rule of Appellate Procedure 8, which authorizes the District Court to stay an action, order, or judgment, pending resolution of an appeal. Defendant is simultaneously petitioning the Court of Appeals for the Ninth Circuit for an **emergency** stay of proceedings in this District Court under Circuit rule 27-3.

1   With one exception, this Court's May 17th Order denying Defendant's Motion to

2   Proceed Pro Se leaves Defendant with no immediate recourse in the shadow of default.

3
4   That one exception is the procurement of a writ of mandamus.   Accordingly,

5   Defendants' are moving as expeditiously as possible to seek appellate review, and have

6   filed a petition for a writ of mandamus simultaneously with this Motion.  As Defendant

7   is nevertheless in the shadow of default, it requests *emergency* relief from this Court in

8
9   the form of a stay of proceedings, for as long as the Ninth Circuit contemplates its

10  appeal, and until it issues a ruling.

11      Plaintiff Armored Republic has expressed to Defendant that it is opposed to a

12  stay.

13
14  **Standard for seeking a stay**

15      This Court has "*inherent power to control the disposition of the causes on its*

16  *docket [to] promote economy of time and effort for itself, for counsel, and for [the]*

17  *litigants*" by staying this matter pending appellate review. *CMAX, Inc. v. Hall*, 300 F.2d

18
19  265, 268 (9th Cir. 1962); see also *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936);

20  *Filtrol Corp. v. Kelleher*, 467 F.2d 242, 244 (9th Cir. 1972); *Mediterranean Enters., Inc.*

21  *v. Ssangyong Corp*, 708 F.2d 1458, 1465 (9th Cir. 1983) ("*A trial court may, with*

22  *propriety, find it is efficient for its own docket and the fairest course for the parties to*

23
24  *enter a stay of an action before it, pending resolution of independent proceedings which*

25  *bear upon the case.*" (citation omitted)).

26      District courts typically apply a four-factor test to determine whether to issue a

27  stay of an order: (1) the applicant's likely success on the merits; (2) irreparable injury to

28

the applicant absent a stay; (3) substantial injury to the other parties; and (4) the public interest. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); see *Nken v. Holder*, 556 U.S. 418, 433-34 (2009); *Leiva-Perez v. Holder*, 640 F.3d 962, 970 (9th Cir. 2011) (Nken requires a showing of irreparable harm, but applies a balancing test showing "that irreparable harm is probable and either: (a) a strong likelihood of success on the merits and that the public interest does not weigh heavily against a stay; or (b) a substantial case on the merits and that the balance of hardships tips sharply in the petitioner's favor"). Defendants easily satisfy all four factors, as will be shown below.

**Argument**

**1. A substantial case on the merits**

Defendant is aware of the unusual position it finds itself in, but believes that it has a substantial case on the merits. Its petition to the Ninth Circuit has been served on all parties to this litigation, and is here appended as Exhibit A. Defendant incorporates all of Exhibit A's arguments here. These include an argument from recent developments in the courts; several arguments from both the US and Arizona constitutions; an argument from a review of contemporary jurisprudential thought as to the nature of "humanness" and the function, rights, and *raison d'être* of a corporation or association of persons; an argument from public policy, which effectively functions as a behavioristic argument; finally, a stark analogy to old English law — and even older, indeed Ancient law — which highlights the notion that default would be an excessive sanction in this or any analogous case. (Still further, Seneca, in his *Laws*, wrote: "*No sensible person punishes because a wrong has been done, but in order that a wrong*

1  *may not be done."*   Defendant feels that default would be a punishment to *neither*

2  purpose, and would constitute an unearned and unjust windfall for Plaintiff.)

3
4  Defendant hesitates to accuse the Court of error, but feels that the Court has

5  clearly erred in not addressing some of these arguments when they were presented in the

6  first Motion to Proceed Pro Se.

7  It may be pointed out that the Court noted in its Order that "[*Citizens United and*

8
9  *Hobby Lobby*] *cannot reasonably be read as eroding the centuries-old rule that*

10  *corporations can appear in federal court only through licensed counsel."*   That this is

11  true, certainly insofar as the particular topic of corporate pro se representation was not

12  directly broached, yet the spirit of the Supreme Court's ruling should be taken into

13
14  consideration, particularly where Justice Alito wrote in the *Hobby Lobby* decision:

15  *"Congress provided protection for people like the Hahns and Greens by*

16  *employing a familiar legal fiction: It included corporations within RFRA's definition of*

17  *"persons." But it is important to keep in mind that the purpose of this fiction is to*

18
19  ***provide protection for human beings.*** *[. . .] When rights, whether constitutional or*

20  *statutory, are extended to corporations, the purpose is to protect the rights of these*

21  *people. For example, extending Fourth Amendment protection to corporations protects*

22  *the privacy interests of employees and others associated with the company. Protecting*

23
24  *corporations from government seizure of their property without just compensation*

25  *protects all those who have a stake in the corporations' financial well-being. And*

26  *protecting the free-exercise rights of corporations like Hobby Lobby, Conestoga, and*

27

28

4

*Mardel protects the religious liberty of the humans who own and control those companies.*"  (Emphasis added.)

What defendant seeks is not the protection of its privacy interests or its religious liberty.  What defendant seeks is *nothing less than its continued existence*, its right to the fruits of its own labor, its right to a trial by jury, its right to directly face charges leveled against it, and indeed more.  If Hobby Lobby deserves protection, Defendant believes that it stands in no lesser need of protection.

Defendant therefore believes that it has, if nothing else, a substantial case on the merits.

It might go without saying that there are, at the very least, dozens of conceivable ways whereby the courts might offer Defendant "protection" and preserve Defendant's right to a trial.  Although leave to proceed pro se is Defendant's favored option, for it feels that begging for assistance or imposing costs upon the court would be less dignified, it noted in its Petition to the Ninth Circuit that it "will not disdain *any* other relief the [Circuit] Court sees fit to offer."  (Emphasis in original.)  This likely makes its case still more substantial on the merits, and its right to a writ clear and indisputable.  *See*, e.g., *Beacon Theatres, Inc. v. Westover*, 359 US 500, 511, "*There can be no doubt that a litigant is entitled to a writ of mandamus to protect a clear constitutional or statutory right to a jury trial.*"

2. **Defendant will be irreparably harmed absent a stay.**

Defendant will suffer immediate, irreparable harm absent a stay.  To Defendant's information and belief, it seems that, as a practical matter, proceedings are either stayed,

or they are not.  If they are stayed, then all parties need only await the Ninth Circuit's determination of Defendant's petition and appeal.  But if they are *not* stayed, then, to Defendant's information and belief, Defendant is in default and staring down a default judgment, which seems as though it would be, at the very least, profoundly unjust, irreparably harmful, and which may render the entire petition for a writ of mandamus moot.  (Or would at least complicate matters severely, impinging upon the economy of the Court and the resources of all parties.)

Default is arguably not warranted in this instance at all.  As noted in the Petition and the Appendix to this Motion, the most-cited theory underlying default judgments is that, by its failure to timely answer or acknowledge the jurisdiction of the court, the defaulting party implicitly *"admits the cause of action is valid, admits [it] has no defense, and consents to suffer judgment." Keeler Bros. v. Yellowstone Valley Nat'l. Bank*, 235 F. 270, 270 (D. Mont. 1916).  This is certainly not the case here.

Even in a more general and less theoretical sense, default is a sanction rightly referred to as "drastic," to be used only in "extreme" situations, and one not always justified by general principles.  *See: "In [the] final analysis, a court has the responsibility to do justice between man and man; and general principles cannot justify denial of a party's fair day in court except upon a serious showing of willful default." Gill v. Stolow*, 240 F.2d 669, 670 (2d Cir. 1957).  *"Default judgments are a drastic remedy, not favored by the Federal Rules and resorted to by courts only in extreme situations." Sun Bank of Ocala v. Pelican Homestead & Sav. Ass'n.*, 874 F.2d 274, 276 (5th Cir. 1989).  "*Judgments by default are drastic remedies and should only be resorted*

*to in extreme situations."  Charlton L. Davis & Co., P.C. v. Fedder Data Ctr., Inc.*, 556 F.2d 308, 309 (5th Cir. 1977).

Further arguments to this effect are in Exhibit A — particularly in pages 17-19, 22, 26-27, 29 — and are incorporated here.

It must also be noted that there is not just "some possibility" of irreparable harm: Plaintiff's counsel has already said, in a telephone status conference with the Court, that they *will* seek to strike Defendant's answer as soon as practicable.

Granted, the underlying principle in determining whether to grant or deny a stay is that "*[t]he right to proceed in court should not be denied except under the most extreme circumstances.*"  *Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc.*, 713 F.2d 1477, 1484 (10th Cir. 1983) (quoting *Klein v. Adams & Peck*, 436 F.2d 337, 339 (2d Cir. 1971)).  Yet the present situation is *by definition* an extreme circumstance, as a default judgment may be involved, and, as noted just above, "*[j]udgments by default are drastic remedies and should only be resorted to in extreme situations.*"

Corollary:  If it's extreme enough for default, it's extreme enough for a stay.

**3. The balance of hardships overwhelmingly favors Defendant.**

When considering the balance of hardships in this instance, where a denial of the present Motion may rapidly lead to a default, one might be reminded of the old adage by Schopenhauer, to "*compare the feelings of an animal that is devouring another with those of the animal being devoured.*"  If a stay is not granted, Plaintiff wins a small immediate victory which may turn into a larger victory via a forced default — yet

Defendant faces nothing less than ruin, and, as stated above, may be deprived of its right to the fruits of its own labor, its right to a trial by jury, and more.  If a stay is granted, then *both parties* wait for the Ninth Circuit to decide Defendant's appeal, which should do little harm to either party, does little or no prejudice to either party, and certainly does no harm remotely comparable to that which Defendant might suffer in the event this Motion is denied.  The balance of hardships overwhelmingly favors Defendant.

**4. The public interest will be served by a stay.**

Normally, the public's interest in any given civil suit is solely that it be resolved in an efficient and just way.  Whereas a stay in this instance would not promote efficiency, it would serve the interests of justice.  Defendant believes that, between efficacy and justice, the latter is the more important, which weighs in favor of granting the present Motion.

But this situation is not normal, it is highly irregular.  It could fairly be said that, in contemplating Defendant's petition, the Ninth Circuit is faced with a question on the frontiers of the law with potentially far-reaching implications.

Defendant's petition to the Ninth Circuit may therefore be one *of profound public interest*, which is yet another point in favor of granting the present Motion.  In *Landis v. North American Co.*, 299 US 248, 256, it was noted by the Supreme Court that, "*[e]specially in cases of extraordinary public moment, the individual may be required to submit to delay not immoderate in extent and not oppressive in its consequences if the public welfare or convenience will thereby be promoted.*"

8

1    Both the interests of justice, and the general public interest, will be promoted if a

2  stay is granted by this Court.

3

4

5                                    **CONCLUSION**

6    For good cause shown, the Court should stay proceedings until the Ninth Circuit

7  Court of Appeals rules on the mandamus petition.

8    DATED and RESPECTFULLY SUBMITTED this 24th day of May, 2021.

9

10

11

12

       Jacob Ganor
13     President and Sole Shareholder, Diamond Age Corp.
       Pro se on behalf of Defendant.
14

15

16

17                            **CERTIFICATE OF SERVICE**

18    I hereby certify that on the 24th day of May 2021, I have mailed this document
   via express courier to the Clerk's Office, and have e-mailed it to:
19

20  Bradley A. Burns, Esq.
   *bburns@dickinsonwright.com*
21  Amanda E. Newman, Esq.
   *anewman@dickinsonwright.com*
22  *Dickinson Wright PLLC*
23  1850 North Central Avenue, Suite 1400
   Phoenix, AZ 85004
24  *Attorneys for Plaintiff*

25

26

27

28  Jacob Ganor

                                         9

# EXHIBIT A

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

**IN RE DIAMOND AGE CORP.**

---

Diamond Age Corporation,

Petitioner

v.

United States District Court, District of Arizona,

Respondant,

Armored Republic, LLC

Real Party in Interest

---

From the United States District Court

District of Arizona

Case No.: CV-20-01366-PHX-DLR

---

**PETITION FOR A WRIT OF MANDAMUS AND AND EMERGENCY**

**MOTION FOR A STAY OF PROCEEDINGS UNDER CIRCUIT RULE 27-3**

## CIRCUIT RULE 27-3 CERTIFICATE

1. Telephone Numbers and Office Addresses of the Attorneys for the Parties

**Attorneys for Real Party in Interest:**

>P. Bruce Converse, Esq.
>*bconverse@dickinsonwright.com*
>
>Bradley A. Burns, Esq.
>*bburns@dickinsonwright.com*
>
>Amanda E. Newman, Esq.
>*anewman@dickinsonwright.com*
>
>*Dickinson Wright PLLC*
>1850 North Central Avenue, Suite 1400
>Phoenix, AZ 85004
>
>Telephone: (602) 285-5000

**Pro se on behalf of Petitioner:**

>Jacob Ganor
>*jakeganor@gmail.com*
>
>1215 S. Kihei Road, Ste O.
>#339
>Kihei, HI 75069
>
>Telephone: (808) 359-7789

II

**Pursuant to Circuit Rule 27-3(a),** I hereby certify that opposing counsel were notified of our intentions to pursue this Petition at the first possible opportunity, namely on May 17th 2021, that the District Court was notified very shortly thereafter, in a telephone status conference that took place on May 18th, and that the district court clerk and all parties were notified of the filing of this Petition and motion immediately upon its completion, on May 24th.

I hereby certify to the Court that, to avoid irreparable harm to petitioners Diamond Age Corp., relief in the form of a stay of proceedings is needed at the Court's earliest convenience, in less than 21 days' time.

1. Regarding Circuit Rule 27-3(c)(ii), the facts showing the existence and nature of the claimed emergency are set forth in detail below in the Statement of the Facts and in the Argument. In brief, entry of a default judgment would constitute the severest form of prejudice against Petitioner. Petitioner therefore requests *emergency* relief in the form of a stay of district court proceedings while its Petition for a writ of mandamus is pending. In addition to the present Petition, Petitioner is simultaneously filing in the district court a Motion for a Stay Pending a Petition for a Writ of Mandamus.

2. Regarding Circuit Rule 27-3(c)(iii), Petitioner certifies to the Court that this motion was prepared and filed at the first possible opportunity, and was drafted in all haste.

3. Regarding Circuit Rule 27-3(c)(iv): This emergency motion, Motion for a Stay Pending Appeal, and Petition for Writ of Mandamus have been

III

served on all parties to the proceedings at the time of this filing.  Real Party in Interest's counsel were notified through e-mails sent on May 17th, and further through a telephone conference held on May 18th, of Petitioner's intended filing of this mandamus petition and emergency motion.  Counsel and the district court are being served with the just-finalized petition and motion simultaneously with this filing, via email and/or express courier.

4.  Regarding Circuit Rule 27-3(c)(v), as set forth in the Petition below (pp. 4, 8-9), Petitioner has sought — and been denied — relief from the district court.  Indeed, the district court's denial of Petitioner's Motion for Leave to Proceed Pro Se, see Exhibit A hereto, is the precipitating event for the instant filing.  Petitioner is simultaneously filing in the district court a Motion for a Stay Pending a Petition for a Writ of Mandamus.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 21-3,

Petitioner Diamond Age Corp. hereby states that it has no parent companies,

subsidiaries, or affiliates that have issued shares to the public.

Dated: May 24th, 2021

By: _____

Jacob Ganor
215 S. Kihei Rd. Ste O# 339,
Kihei, Hawaii, 96753
Telephone: 808-359-778
Email: jakeganor@gmail.com
*Pro se on behalf of Petitioner.*

v

# TABLE OF CONTENTS

I. Introduction and Statement of Case ……...…………………………………… 1

II. Statement of Subject Matter Jurisdiction ……………………………………..4

III. Relief Sought ……………………………………………………………………4

IV. The Issues Presented …………………………………………………………5

V. Argument ……………………………………………………….……………..6

    A.  Petitioners Have No Other Adequate Means to Relief and Petitioners

Will Be Damaged and Prejudiced In a Way Not Correctable on Appeal ..……..6

    B.  The District Court Erred as a Matter of Law …………………………...8

        i. There is Little Justification for the Rule Prohibiting Corporate Pro Se

Representation …………………………………………………………….9

        ii.  The Expansion of Corporate Rights 2008-Present …………………..13

        iii.  Obligatory Counsel in View of the Star Chamber…………………17

        iv.  A Corporate Pro Se Right is Justified on Public Policy Grounds ….19

        v. There is a Constitutional Argument in Favor of a Corporate Pro Se

Right …..……………………………………………………………… 23

        vi.  There is Precedent ……………………………………………….25

        vii.  An Old and Oft Repeated Error of Law …………………………...27

    C. The District Court's Order Raises New and Important Problems or Issues

of Law of First Impression ………………………………………....……….28

    D. The Court Should Stay Proceedings, Pending Resolution ……………...30

VI. Conclusion ………………………………………………………………..30

## TABLE OF AUTHORITIES

### CASES

Perry v. Schwarzenegger, 591 F.3d 1147, 1156-57 (9th Cir. 2010) ............ 4

Bauman v. U.S. Dist. Court, 557 F.2d 650, 654-55 (9th Cir. 1977) .......*passim*

Admiral Ins Co. v. United States Dist. Court, 881 F.2d 1486, 1491   (9th

Cir.1989)..................................................................................7

Klinghoffer v. S.N.C. Achille Lauro,  921 F.2d 21, 24 (2d Cir. 1990) ..........7

Consub Delaware LLC v. Schahin Engenharia Limitada, 476 F.Supp.2d 305,

309 (S.D.N.Y.2007) ...................................................................8

Milbert v. Bison Labs., 260 F.2d 431, 433-35 (3d Cir.1958) ....................8

Osburn v Bank of the United States, 22 US 738 (1824) ..........................9

Prudential Ins. Co v Small Claims Court, 76 Cal. App. 2d 379, 384-385 .....10

Brandstein v. White Lamps, 20 F. Supp. 369 (S.D.N.Y. 1937)  ................11

Monell v. Dep't of Soc. Servs., 436 U.S. 658, 687 (1978) ......................13

The Railroad Tax Cases, 13 F. 722, 744 (C.C.D. Cal. 1882) ....................14

Proprietors of Charles River Bridge v. Proprietors of Warren Bridge, 36 U.S.

420 (Pet. 1837) .........................................................................15

Citizens United v. Federal Election Commission 558 U.S. 310 (2010) ........15

Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682 (2014) ....................16

Faretta v. California, 422 U.S. 806 (1975) ......................................17

Keeler Bros. v. Yellowstone Valley Nat'l. Bank, 235 F. 270 (D. Mont.

1916) ……………………………………………..……………………...18

Beacon Theatres, Inc. v. Westover, 359 US 500, 511 ………………..………25

Ex parte Simons, 247 U. S. 231, 239-240 …………………………..……....25

Ex parte Peterson, 253 U. S. 300, 305-306 …………………………..……......25

Sellent-Repent Corp. v. Queens Borough G. E. Co., 160 Misc. 920, 290 N.Y.S.

887 (N.Y. Misc. 1936) ……………………………………..…………...26

Matter of Holliday's Tax Services, Inc., 417 F. Supp. 182 (E.D.N.Y.

1976) …………………………………………………………………………26

Victor Co. v. Sleininger, 255 App. Div. 673 (N.Y. App. Div. 1939) ….……27

Quarrier v. Peabody Ins. Co. 10 W. Va. 507 …………………..…………..27

United States v. Reeves 431 F.2d 1187 (9th Cir. 1970) ……………..……….27

United States v. Burk, EP-14-CR-240-DCG (W.D. Tex. Jun. 18, 2014) .....27

Fraass Survival Systems v. Absentee Shawnee, 817 F. Supp. 7 (S.D.N.Y.

1993) …………………………………………………………………….27

Leiva Perez v. Holder, 640 F.3d 962, 970 (9th Cir. 2011)…..…:………….30

## CONSTITUTIONAL PROVISIONS

US Const., Amend. V …………………………………………………..……23

US Const., Amend. XIV……………………………………………..………… 23

Ariz Const, 2 Section 4 ………………………………………..……….....23

Ariz Const, 2 Section 13 …………………………………………..…………24

US Const., Amend. VII …………………………………..……………....25


**STATUTES**

28 U.S.C. § 1651 …………………………………………………....4, 30

28 U.S.C. §1292 ………………………………………...………….. 7

28 U.S.C. §1927 …………………………………,……………...…...13

1 U.S.C. §1 …...…………………………………………....14, 21

28 U.S.C. §1332 ……………………………………………………...24

## I. **Introduction and Statement of Case**

Petitioner, Diamond Age Corporation, is a small research and development corporation that develops and manufactures ballistic armor and related products.  Real Party in Interest, Armored Republic, manufactures and sells ballistic armor, body armor, and other products. In June 2019, the parties entered into negotiations where the ultimate intention was that Armored Republic would market and distribute a helmet product developed over the previous couple years by Petitioner.

In September 2019, the parties were engaged in drafting an "AR500 Armor Marketing and Distribution Agreement," which would have provided that Armored Republic is the exclusive distributor, in most of the world, of certain helmet shells and other products developed and manufactured by Petitioner.

A framework for the agreement was completed, while certain essential terms — such as price — were still subject to negotiation, as acknowledged by both parties.

While these negotiations were ongoing, and *before* a draft of a completed Distribution Agreement containing a price term was circulated, Armored Republic sent Petitioner a purchase order for 1,000 helmets at a at a specially-negotiated discounted price of $95 per helmet for that order only.

Shortly after that purchase order was received, and in an effort to complete the Distribution agreement in good faith, Petitioner offered $120 per

1

helmet as part of "Exhibit B" to the Distribution Agreement, an offer which Armored Republic never acknowledged, accepted, or signed.  Petitioner, also, did not sign the draft "Exhibit B."

Section 22(b) of the Distribution Agreement framework contains an integration clause requiring that all terms, including amendments, be written and signed by both parties to be enforceable.  Since neither party signed Exhibit B with its offered price term of $120, the Distribution Agreement never became complete or enforceable.

Petitioner delivered all 1,000 helmets to Armored Republic, pursuant to their purchase order.  Armored Republic breached the purchase order by failing to pay $55,225. Adding insult to injury, Armored Republic attempted to use that outstanding payment as a bargaining chip in negotiations over the Distribution Agreement, effectively saying that they will make their payment *if* Petitioner makes permanent contractual concessions and offers further discounts.

Based on that wanton material breach — and, as a secondary consideration, on Armored Republic's conduct, including their failure to engage in reasonable marketing efforts and their misrepresentations in claiming that they are the helmet's manufacturer — Diamond Age gave notice of termination of the Distribution Agreement, as a formality.  This met with no response from Armored Republic, and, in the event the Distribution Agreement was ever a valid contract, properly took effect following a 30-day cure period.

Twenty-three days into that cure period, Armored Republic served Petitioner with an action in Arizona State Superior Court, seeking to enforce, via injunction, the incomplete Distribution Agreement framework which they earlier couldn't bother to sign or acknowledge, and which was *en route* to proper termination in the event it ever became enforceable.  This, ostensibly, in an effort to bar Petitioner from selling the helmet to other interested parties.

Armored Republic also sought, at minimum, $500,000 in damages.  It must be noted that despite Rule 26 and Comments, Armored Republic have still not provided a calculation of damages or supplied or identified supporting documents.

This action was promptly removed to the Federal District Court on basis of diversity jurisdiction.

Petitioner then sought to vigorously defend itself with the aid of counsel, filing eight counterclaim counts against Armored Republic, largely for breach of the October 14, 2019 purchase order, for failure to pay $55,225 for the 1,000 delivered helmets, for conversion and unjust enrichment, and for breach of the covenant of good faith and fair dealing, among others.

Over nine months, the case proceeded through to the early stages of discovery.  By March 2021, Petitioner was forced to part ways with counsel because it could no longer afford to pay their bills and because said counsel would not entertain working on a contingency or deferred compensation basis.

Said bills by this time had totaled nearly $80,000, far exceeding the $55,225 that Armored Republic had already deprived Petitioner of.

Petitioner assiduously sought the assistance of new counsel, eventually going so far as to contact its congressman and various legal aid providers. Attorneys that will assist in a small-dollar corporate defense on a contingency fee or deferred compensation basis are, it seems, thin on the ground. But Petitioner was raised to believe that justice should be "blind" — that is, administered fairly without regard for a person's ability to pay. (Or any other *incidental* trait of that person.) In this spirit, because Petitioner finds there are compelling reasons as to why it should be allowed to proceed in the proper person of its president and sole shareholder, and because Petitioner feels that a default judgment would be an unwarranted and unjust outcome for reasons detailed further below, Petitioner filed an application for leave to proceed pro se with the district court. That application denied, the issue now comes before this Court.

### II. Statement of subject matter jurisdiction

This Court has jurisdiction over this Petition pursuant to the Rule 21 of the Federal Rules of Appellate Procedure and the All Writs Act, 28 U.S.C. § 1651.  See *Perry v. Schwarzenegger*, 591 F.3d 1147, 1156-57 (9th Cir. 2010).

### III. Relief sought

Petitioner seeks a writ of mandamus, directing the lower court to enter an order granting Petitioner leave to appear pro se — in the proper person of its

President and sole shareholder — in all currently pending district court proceedings, and vacating the lower court's denial of Petitioner's motion to proceed pro se.

In the alternative, Petitioner seeks a writ directing the lower court to appoint counsel so that Petitioner may expeditiously file dispositive motions with the lower court, with the assistance of counsel.

Petitioner also respectfully requests that this Court issue an immediate stay of all proceedings in the lower court, pending the determination of this Petition and, if the Petition is granted, until such time that the Appeal is decided

### IV. The issues presented

Whether corporations that cannot afford an attorney must necessarily default, and therefore be denied their day in court, or whether there are any other avenues open to them, including the possibility of appearing in the proper person of their sole owner and shareholder.

Whether this is in any respect tempered if they are named defendants in the action, have already raised credible defenses and counter-claims with the assistance of counsel, or have shown a basic level of competency and are acting in good faith.

Whether recently-attained consensus opinions on the theories underlying corporate personhood, and certain recent Supreme Court decisions made thereupon, modulate the above issues.

Whether the sixth and fourteenth amendments to the US Constitution guarantee that all persons, including corporations, can have their day in court — that there shall be no deprivation of property without judgment — and whether being compelled to hire counsel on pain of a default judgment constitutes deprivation of property before judgment.

Whether forcing a corporation unable to find representation into default would deprive that corporation of its constitutional right to a jury trial.

### V. Reasons why the writ should issue

In determining whether to issue a writ of mandamus, this Court must balance the following five "Bauman" factors, elucidated in *Bauman v. U.S. Dist. Court*, 557 F.2d 650, 654-55 (9th Cir. 1977): "(1) whether petitioner has no other adequate means . . . to attain the relief desired; (2) whether petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the district court's order is clearly erroneous as a matter of law; (4) whether the district court's order is an oft repeated error or manifests persistent disregard for the federal rules; and (5) whether the district court's order raises new and important problems or issues of law of first impression." It is not a requirement that all five factors be satisfied, and indeed the fourth and fifth are to some extent contradictory, but in this instance all factors weigh in favor of issuing the writ. Petitioner addresses each factor below, in sequential order:

**A. Petitioners have no other adequate means to relief and petitioners will be damaged and prejudiced in a way not correctable on appeal**

The first Bauman factor is met when "the petitioner lacks an alternative avenue for relief." *Admiral Ins. Co. v. United States Dist. Court*, 881 F.2d 1486, 1491 (9th Cir.1989).

With the district court's denial of Petitioner's motion for leave to proceed pro se, Petitioner has no other adequate means to attain the relief sought by this Petition and will be irreparably damaged and prejudiced without this Court's intervention, particularly as opposing counsel has already indicated, in a district court case status conference on 5/18/21, that they are inclined to soon seek entry of default.

Petitioner has not sought to certify the district court's order for interlocutory appeal. Under 28 U.S.C. §1292(b), courts have discretion to allow an interlocutory appeal when an order (1) presents a controlling question of law; (2) as to which there is substantial ground for difference of opinion; and (3) the resolution of which would materially advance the ultimate termination of the litigation.

With regards to the first: A question is controlling when "*reversal of the district court's order would terminate the action*," *Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 24 (2d Cir. 1990), or, "*at a minimum,*" where "*determination of the issue on appeal would materially affect the litigation's*

outcome." *Consub Delaware LLC v. Schahin Engenharia Limitada*, 476 F.Supp.2d 305, 309 (S.D.N.Y.2007).

With regards to the third: §1292(b) "*is reserved for those cases where an intermediate appeal may avoid protracted litigation.*" (citing *Milbert v. Bison Labs.*, 260 F.2d 431, 433-35 (3d Cir.1958)). Courts "*place particular emphasis on the importance on [the] last factor*" of § 1292(b), *Consub Delaware LLC*, 476 F.Supp.2d at 310.

In the present instance, the question of law, however serious, is not controlling, nor would granting an interlocutory appeal serve in any way to shorten the litigation.

No further procedures exist whereby Petitioner may seek relief, so the first Bauman factor weighs in favor of granting mandamus.

Without mandamus relief, Petitioner will suffer substantial harm, and perhaps indeed fatal harm, that is not remediable later on appeal. Therefore, the second Bauman factor, which is closely related to the first, also weighs in favor of granting mandamus.

### B. The District Court erred as a matter of law.

The district court's core argument in denying Petitioner's motion rests upon the claim that the prohibition of corporate pro se representation is founded on a long line of well-reasoned precedent. Even if this claim were true, it should not prevent the abolition of a rule of law which is repugnant to the even-handed administration of justice. In addition, it is not even clear that the claim is true.

Though the precedent exists, the authorities generally cited for this doctrine lack clarity and precision, as will be shown in detail below.

Further, the district court did not substantively engage with Petitioner's arguments. It simply noted that "*this Court, as a district court, is not empowered to buck centuries of precedent*." However justified, this constitutes a clear error — that of omission. Petitioner's motion was not given full and fair consideration on the merits. Thus Petitioner's arguments, reconsidered and revised, will be reproduced below and now come before this Court.

**1. There is little justification for the rule prohibiting corporate pro se pepresentation.**

The rule prohibiting corporate pro se representation in the United States is nearly 200 years old, dating back to *Osburn v Bank of the United States*, 22 US 738 (1824), where the Supreme Court noted in passing that "*[a] corporation, it is true, can appear only by attorney, while a natural person may appear for himself*." Osburn has been repeatedly cited to that effect in the nearly two centuries since, and although no rationale was given for the rule in Osburn, subsequent court opinions and judgments have filled in the blanks.

Osburn has been justified on theoretical grounds in a manner that can be summarized very simply: As corporations are not natural persons, they can act only via agents and officers. Therefore, if they are to act in court they must act via officers of the court, i.e. via lawyers.

This justification, however old and frequently-cited, does not hold up to scrutiny. It is self-evidently circular; it assumes its own conclusion. As Judge Timothy Cotner put it in *May a Corporation Act as Its Own Attorney*, 16 Clev.-Marshall L. Rev. 173 (1967), it does not answer "*why corporations need agents in a courtroom and why can't actions of natural people impute to the corporation's action in its own right just as they do in every other instance.*"

After all, corporations are afforded the rights to sue and be sued, to enter into contracts, to testify in court as 30(b)(6) witnesses, and to defend themselves and press claims in small claims court, among many other constitutionally granted rights. When testifying in court, and when defending themselves in small claims court, corporations stand on equal footing with natural persons. In such instances, they don't require an outside agent — and, indeed, are frequently barred from employing outside agents. In such cases, "*the corporation appears in propria persona through some proper representative.*" *Prudential Ins. Co v Small Claims Court*, 76 Cal. App. 2d 379, 384-385. These instances illustrate that it is possible for a corporation to represent itself in court on its own behalf, through a non-lawyer representative — that it is possible for a corporation, despite being an artificial entity, to take action in a court of law in the United States of America.

It is important to emphasize that when a corporation appears in small claims court, it is simply appearing pro se, as any other plaintiff or defendant would appear pro se. The person representing the corporation *is* the corporation

for the claim or defense; the corporation is not appearing via an "other person." This highlights the notion that corporations can, in certain court settings, possess agency, and that the notion that they must always act via an outside agent in court is malleable, rather than set in stone.

Thus corporations *can* act on their own behalf in court, *when they are given leave*. It is not that they *cannot* act on their own behalf and therefore *must* employ an agent, but that they are, as a *general* rule, *not given leave* to act on their own behalf in court.

A secondary, but still relatively oft-repeated interpretation derived from Osburn holds that directors or officers of corporations are constitutionally unfit to argue cases pro se. This derives not from law or statute, but from concerns that permitting non-attorney corporate parties to bring claims invites abuse of court processes and unscrupulous conduct. This position was articulated in *Brandstein v. White Lamps*, 20 F. Supp. 369 (S.D.N.Y. 1937):

*"Were it possible for corporations to prosecute or defend actions in person, through their own offices, men unfit by character and training, men, whose credo is that the end justifies the means, disbarred lawyer or lawyers of other jurisdiction would soon create opportunities for themselves as officers of certain classes of corporations and then freely appear in our courts as a matter of pure business not subject to the ethics of our profession or the supervision of our bar associations and the disciplines of our courts."*

This also fails to hold up to scrutiny, for the ruling in *Brandstein* makes a baseless empirical claim that men of business are "unfit by character" to represent themselves in court.  Leaving aside for a moment the question of whether or not this is true, the federal courts have been inundated for *decades* with pro se litigation from people in the prison system. If the legal system can allocate vast resources to hear thousands of cases per year from convicted criminals, who have already proven themselves to be "unfit by character" for free participation in society, perhaps it might also be able to make room for small business owners.

And are men of business inherently less ethical than officers of the court?  This empirical proposition has been evaluated in the context of commercial and regulatory law by Parker et al. in the Georgetown Journal of Legal Ethics. (See: Parker et al., *The Two Faces of Lawyers: Professional Ethics and Business Compliance With Regulation*. Georgetown Journal of Legal Ethics, Vol. 22, 2009.)  Their analysis indicates that lawyers are no more ethical than the businessmen who employ them, and may be less ethical, in that "*[o]ur data suggest that to the extent lawyers influence clients, it is towards game-playing, not commitment to compliance or resistance to compliance.*"

Further, the overall impression received by Parker is that: "*lawyers supply services that incline clients to increasingly accept legal risk and adopt a gamester approach to law and regulation.*"

Clearly, this does not suggest that lawyers have a monopoly on ethics.  Thus the notion that lawyers are uniquely or especially ethical, and that non-lawyer businessmen are too unethical to be trusted to defend themselves in court, seems to be at minimum unfounded, and is apparently simply false as an empirical proposition.

In any case, this secondary interpretation of Osborn also *wholly disregards the court's ability to manage litigation* under Rule 11, 28 U.S.C. 1927, the rules regarding discovery abuse, and the court's inherent power.  Disbarred lawyers who improperly attempt to weasel their way back into the courtroom by declaring themselves officers of corporations can, and probably should, be sanctioned or held in contempt.  That does not apply in this case, nor does it seem that it should apply in any case where the party in question is named defendant — i.e., is not in court of his or her own free will.

Ultimately, the reasons given for the prohibition on corporate pro se representation have scant logical and factual justification.

### 2.  The expansion of corporate rights 2008-present.

The Supreme Court has explicitly stated that a precedent can be overruled if its logic has been weakened by intervening decisions, and such gradual erosion is often how a once-important precedent loses its force, whether or not it is ever formally overruled.

Corporations have long been considered "persons."  As Justice Brennan explained in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 687 (1978), *"by 1871,*

*it was well understood that corporations should be treated as natural persons for virtually all purposes of constitutional and statutory analysis.*"

The Dictionary Act, 1 U.S.C. 1, notes that "*the words "person" and "whoever" include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals.*" The Supreme Court has ruled along such lines since the emergence of the modern corporate form in the 19th century. (With the rise of general incorporation statutes after the Civil War, any entrepreneur became able to use the corporate form for any lawful purpose.) "Corporate personhood" has become settled, and is unambiguous as a matter of law.

On a theoretical level, the courts have generally supported the so-called aggregate theory of the firm. That is, the notion that the corporation is "*an association of individuals contracting with each other in organizing the corporation, with its core attributes as an artificial legal person supplemented by the attribution to it of constitutional rights of its shareholders.*" (See Philip Blumberg, *The Corporate Personality in American Law: A Summary Review*, AM. J.COMP. L. 49, 49 (1990))

In *The Railroad Tax Cases*, 13 F. 722, 744 (C.C.D. Cal. 1882), Justice Field encapsulated the core concept underlying the aggregate theory succinctly:

*"It would be a most singular result if a constitutional provision intended for the protection of every person against partial or discriminatory legislation by the states should cease to exert such protection the moment the person*

*becomes a member of the corporation. . . . The courts will always look beyond the name of the artificial being to the individuals whom it represents.*"

Even older judgments have looked past the artificial nature of the corporation to emphasize the "individual[s] whom it represents."  For instance, *Proprietors of Charles River Bridge v. Proprietors of Warren Bridge*, 36 U.S. 420 (Pet. 1837):

*"It is the object and effect of the incorporation, to give to the artificial person the same capacity and rights as a natural person can have. . . . It bestows the character and properties of individuality on a collective and changing body of men, by which their rights become as sacred as if they were held in severalty by natural person. . . ."*

**Yet, even with all of that said, there has been a vast, and much commented upon, expansion in corporate rights over the past 13 years.**

In 2008, *Citizens United v. Federal Election Commission* 558 U.S. 310 (2010) was said, perhaps somewhat wrongly in light of the above, to have marked a pivotal shift in the court's understanding of corporations and their legal rights. A nonprofit corporation, Citizens United, challenged the constitutionality of a federal statute which suppressed their ability to participate in electioneering campaigns.  The Supreme Court found that the statute's prohibition was an unconstitutional ban on political speech -- for, as the corporation is fundamentally an association of individuals, the corporation

should not be treated differently from a natural person under the First Amendment.

In so doing, the Supreme Court explicitly endorsed the aggregate theory of the firm, and gave their support to the notion that corporations deserve legal rights because those rights ultimately protect the corporations' real-life constituents.

This point is sharpened when one considers *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014), wherein it was held that corporations *themselves* have a right to religious freedom under the First Amendment under federal statute, and are entitled to an exemption from the ACA mandate to cover birth control in employee health plans. In his majority opinion, Justice Alito pointedly emphasizes that the purpose of the legal fiction of corporations as persons is ultimately for the benefit of humans: "*protecting the free-exercise rights of corporations like Hobby Lobby . . . protects the religious liberty of the humans who own and control those companies.*"

Hobby Lobby makes clear the proposition that *the protection of the individuals who make up the firm* is the key issue at stake, *not the protection of the firm in its own right, as a separate entity.* **Along exactly the same lines, affording corporations the ability to defend themselves pro se would protect the individual freedoms of the humans who own and operate corporations, and similarly situated small businesses and organizations.** This includes the freedom to assert one's rights, the freedom to defend oneself in court regardless

of financial status, and the freedom not be deprived of one's livelihood by court

or government action, which is a freedom of unparalleled importance. For, as

Shakespeare once had Shylock say, *"you take my life / When you do take the*

*means whereby I live."*

### 3.  Obligatory counsel in view of the Star Chamber

In *Faretta v. California*, 422 U.S. 806 (1975), the Supreme Court briefly

characterized the infamous Star Chamber of Tudor and early Stuart England.

> *"[The] Star Chamber has for centuries symbolized disregard*
> *of basic individual rights. The Star Chamber not merely allowed*
> *but required defendants to have counsel. The defendant's answer to*
> *an indictment was not accepted unless it was signed by counsel.*
> *When counsel refused to sign the answer, for whatever reason, the*
> *defendant was considered to have confessed. Stephen commented*
> *on this procedure: "There is something specially repugnant to*
> *justice in using rules of practice in such a manner as to debar a*
> *prisoner from defending himself, especially when the professed*
> *object of the rules so used is to provide for his defense." 1 J.*
> *Stephen, A History of the Criminal Law of England 341-342 (1883).*
> *The Star Chamber was swept away in 1641 by the revolutionary*
> *fervor of the Long Parliament. The notion of obligatory counsel*
> *disappeared with it."*

That notion did not quite disappear. Petitioner begs the Court consider

the following: The district court does not merely allow but requires Petitioner

to have counsel. Petitioner's answer and meritorious counter-claims are not

accepted unless signed by counsel, and are *stricken and discarded* unless

Petitioner retains counsel at all times through the lengthy course of the

proceedings. If Petitioner cannot afford to retain counsel, or wishes to provide

for its own defense for any other reason, Petitioner is considered to have

confessed. (The most-cited theory underlying default judgments is that, by its failure to timely answer or acknowledge the jurisdiction of the court, the defaulting party implicitly *"admits the cause of action is valid, admits [it] has no defense, and consents to suffer judgment." Keeler Bros. v. Yellowstone Valley Nat'l. Bank*, 235 F. 270, 270 (D. Mont. 1916))

The aforementioned practice of the Star Chamber was considered "specially repugnant to justice" as long ago as 1883. Yet analogous situations persist, as in the present instance.

It is especially illustrative to consider the 1637 Star Chamber prosecution of Burton, Bastwick, and Prynne for seditious libel. The three men composed answers to the charges against them, but because those answers were not signed by an attorney, they were stricken and discarded. Pyrnne begged the court to accept an answer written and submitted by his own hand, noting that he *"cannot procure"* counsel, and citing interesting precedent from Ancient Judean and Roman Law:

> *"Because by the judiciall Law among the Jewes, every man was to make his owne defence, neither did their Law judge any man, before it heard him and knew what hee did. John 7. 51. And by the civill Law, even among the Pagan Romans, it was not the manner to condemne any man, before that hee who was accused had the accusers face to face, and had Licence to answer for himselfe concerning the crime layd against him, Acts 25. 16. If then the Lawes amongst Jewes, and Pagans, gave every defendant leave, thus to make answer for himselfe, and **never condemned any as guilty for not answering by counsell** (as appeares by the cases of Naboth, Susanna, Christ and others, though unjustly condemned, yet not without a full hearing, and witnesses first produced, though false,) this defendant humbly conceiveth, that by the Lawes and*

> *Justice of this Christian Common-Wealth, and this honorable*
> *Court, hee ought to have like liberty in this cause of so great*
> *consequence, and that the Information against him ought not to be*
> *taken, Pro confesso, without hearing witnesses, or defence."*

Pyrnne also referred to Alexander Leighton's trial, seven years prior,

wherein the Crown's attorney general himself had moved that the Star Chamber

accept Leighton's answer under Leighton's own hand, unsigned by counsel,

"*lest the defendant thereby excuse his contempt in not answering.*"

But Pyrnne was not so fortunate.  His answer was struck, and he was

convicted, on arbitrary and strictly procedural grounds.  *Similarly, Petitioner's*

*answer and meritorious counter-claims will be struck, and Petitioner may be*

*held **pro confesso**, unless this Court intervenes.*

To conclude the tale: Pyrnne was sentenced to mutilation, which was

carried out, and to life imprisonment in Jersey's Mont Orgueil.  There he was,

by all accounts, treated fairly by the island's governor, and was soon in any case

freed by the Long Parliament in 1640, the judgment against him declared illegal.

### 4. A corporate pro se right is justified on public policy grounds

### i. Non-lawyer representation in the courts now exists.

Public policy is shifting towards the expansion of access to justice in

remarkably innovative ways.

Arizona — home of the the district court action which is the cause of this

Petition — has just started to allow non-lawyers to practice law as

"paraprofessionals," and has also recently begun to permit non-lawyer

ownership and direction of — and outside investment in — law firms. With these innovations, the right to practice law is evidently becoming broader, and these innovations were *explicitly* instituted for the aforementioned reasons of access to justice and the protection of citizens' rights.

"*The court's goal is to improve access to justice and to encourage innovation in the delivery of legal services,*" Arizona Supreme Court Chief Justice Robert Brutinel said in a recent statement.

*Thus non-lawyers already argue cases on behalf of clients in Arizona.* Though there are admittedly certain limitations on the ability of paraprofessionals to practice law, "*only lawyers may represent others in court,*" is no longer a truism. On balance, this is a point in favor of allowing a corporate pro se right; it indicates that the logical basis for the prohibition of corporate pro se representation is eroding and losing its force.

### ii. **Contra corporatism, in support of small business.**

The notion, stated above, that the people behind corporations need any further protection might seem unusual, given the high profile and obvious financial and political power of so many large corporations. But this notion is no less true for all that, for the large corporation is the exception rather than the rule: The vast majority of corporations in this country are closely held. The IRS estimates that there are more than 5 million active S corporations in the United States, and over a million active C corporations. Only a tiny fraction of these corporations are publicly traded; the number of publicly traded American

corporations peaked at 8884 in 1997, and is now closer to 6000. So although the word "corporation" is often casually associated with the famous logos of powerful mega-corporations, the overwhelming majority of corporations in the USA are nothing like Amazon or Exxon, but instead are small owner-managed firms: The mom-and-pop grocer; the small town real-estate management firm; the cell-phone repair shop. The individuals behind these small corporations would be protected if they can assert a pro se right; it would improve their access to justice, and, pointedly, would somewhat alleviate the coercive or threatening aspect of litigation *in itself*. It would guarantee small firms the opportunity to be heard; for, whether they are mounting a defense or claiming a legal right, there is no way to determine the truth of their position except by adjudication. Failure to do so denies them access to the courts.

The Dictionary Act does not distinguish between closely-held corporations, publicly-traded corporations, and nonprofit corporations. It designates all "corporations" as persons. The corollary is simply that *all* corporations and associations of persons deserve to be able to exercise pro se privileges. This is worth special mention because although it would benefit the vast majority of closely-held corporations, it would not benefit large publicly-traded corporations, and, by at least partially ameliorating the coercive aspect of litigation, may even inconvenience them. It would become that much harder to bully smaller firms in negotiations, or destroy them in legal wars of attrition.

Thus, though it would be facile to view allowing a corporate pro se right as a boon for corporatism and yet another expansion of corporate power, in practice it would be *precisely the opposite*.  By mandating, as a general rule, that *all* corporations, no matter their size, acquire representation in *all* matters brought before the court, including defenses, the legal system can serve a gatekeeper function that stymies competition and free enterprise, poses a barrier to grassroots entrepreneurship, and, to reiterate for emphasis what was just noted above, it renders small businesses excessively sensitive to intimidation from both competitors and regulators. The general rule benefits large business at the expense of small business and nascent competition.  This is simply because, in many instances, small businesses cannot afford the increasingly onerous expenses associated with professional legal representation.

Allowing corporations to mount their own defense will balance the scales of justice, helping to ensure that these small corporations and start-up companies can *assuredly* have their day in court at no exorbitant cost, particularly when paying for representation would destroy them or strangle them in their cradle — *as in the present instance*.  Allowing corporations and other associations of persons to mount their own defense will, as such, not only protect the liberties of the humans who own and control small corporations, it will *empower them in the face of the law*, and will surely foster a more competitive business landscape, *thereby making for good public policy in addition to more equitable justice*.

**4. There is a constitutional argument in favor of a corporate pro se right.**

It must also be argued that corporations may enjoy a constitutional right to represent themselves pro se, which Petitioner begs this Court consider.

The Fifth Amendment clearly states that one cannot be denied one's property without due process of law, and the Fifth Amendment has been found to be applicable in civil cases.  In a rare case of Constitutional reiteration, the Fourteenth Amendment says much the same thing: *"nor shall any State deprive any person of life, liberty, or property, without due process of law"*

The Arizona Constitution contains the same language, (Ariz Const, 2 4):  *"No person shall be deprived of life, liberty, or property without due process of law*."

Being forced to pay for legal representation — on pain of a default judgment which is tantamount to a death sentence for many a corporation, and in many cases would inflict terrible injustice — is *plainly* deprivation of property before judgment.

This is especially true as there is a severe paucity, if not an outright lack, of Legal Aid services for small businesses and corporations.  And in contrast to Plaintiffs' firms who routinely accept cases on a contingency basis, virtually no law firms will take on the defense of a corporation on contingency.  Thus in order to defend themselves, corporations must pay, *before and without judgment.*

Certainly, with some luck, a corporation might find counsel willing to work on a contingency basis, or another sort of alternate fee arrangement — but this cannot be taken for granted, and it typically only applies in a narrow subset of cases. Many corporations can beg for assistance in their defense, and yet find none. This depends on factors including the type of their case, the amount in dispute, the presumptive ability of plaintiff to pay a judgment, and many other considerations, including mere luck. *Should justice be denied, in any case, because it does not appeal to lawyers who work on a contingency basis and seek a portion of the recovery?* Besides, *begging for assistance on a contingency basis, hat in hand, is injurious to one's dignity*; mounting one's own defense pro se — or defending one's own property or domain pro se, as the case may be — is the more honorable thing.

Arizona Substantive Law is controlling in this civil case, and the Arizona Constitution (Ariz Const, 2 13) also notes that "*[n]o law shall be enacted granting to **any citizen, class of citizens, or corporation** other than municipal, privileges or immunities which, **upon the same terms**, shall not equally belong to **all citizens or corporations**.*" (Emphasis added.) The ability to argue one's case in court is a privilege, and has been referred to as such, but does not belong equally to all citizens and corporations, still less is it offered on equal terms. Arizona's natural citizens clearly enjoy a pro se right denied to corporations and corporate citizens. *See also, e.g.*, 28 U.S.C. §1332, which defines corporations as citizens for the purposes of Federal diversity jurisdiction.

Finally, on this score, the Seventh Amendment protects Petitioner's right to a jury trial. Yet, in the present instance, denying Petitioner's motion to proceed in the proper person of its President and sole shareholder may force default, deprive Petitioner of the right to a jury trial, and deny it its day in court. This after Petitioner has already made an answer signed by an attorney, has acknowledged the proper jurisdiction of the lower court, and stands *semper paratus* to answer any complaint laid against it.

It must be further noted that the issuance of a writ of mandamus is proper in such an instance. The Supreme Court, in *Beacon Theatres, Inc. v. Westover*, 359 US 500, 511, stated in the bottom line of their ruling that, "*Whatever differences of opinion there may be in other types of cases, we think the right to grant mandamus to require jury trial where it has been improperly denied is settled.*" In support of this assertion, The Supreme Court cited many cases including *Ex parte Simons*, 247 U. S. 231, 239-240, and *Ex parte Peterson*, 253 U. S. 300, 305-306. Even the dissenting Justices noted, in the first line of their dissent, "*There can be no doubt that a litigant is entitled to a writ of mandamus to protect a clear constitutional or statutory right to a jury trial.*" This, independently of *Bauman*, is a factor which weighs in favor of granting mandamus.

### 5. There is precedent

There is little precedent for a corporate pro se right, but there *is* precedent.

In *Sellent-Repent Corp. v. Queens Borough G. E. Co.,* 160 Misc. 920, 290

N.Y.S. 887 (N.Y. Misc. 1936), a New York court determined that a corporation

can represent itself.

> *"A corporation is a legal entity, often spoken of as an artificial person and by the same fiction like a natural body having power to act and reason. A corporation may employ an agent or attorney to act on its behalf in the same manner as a natural person, but the act of the corporate officer in employing an agent is the act of the corporation. [...] When a corporation does not go outside its own corporate machinery in the performance of a corporate act, it is acting in person and upon an equal footing with a natural person, including the right to sue in person."*

Similarly, and more forcefully, the Eastern District of New York allowed

a corporation to represent itself in bankruptcy, in *Matter of Holliday's Tax*

*Services, Inc.,* 417 F. Supp. 182 (E.D.N.Y. 1976).   There the court forcefully

noted:

> *"The theory is clear. A corporation is an artificial entity which can act only through agents. 9 Fletcher on Corporations § 4463 (1931, Cum.Supp.1975). Courts require that a special form of agent, an attorney, appear for corporations in litigation for the "protection of the courts and the administration of justice." Mercu-Ray Industries, Inc. v. Bristol-Myers Company, 392 F.Supp. 16, 19 (S.D.N.Y.), aff'd, 508 F.2d 837 (2d Cir. 1974). No doubt the rule protects the courts "from pleadings awkwardly drafted and motions inarticulately presented." Simbraw, Inc. v. United States, 367 F.2d 373, 375 (3d Cir. 1966).*
>
> *"A person's day in court is, however, more important than the convenience of the judges. We recognize this hierarchy of values when we guarantee by statute (28 U.S.C. § 1654) and Constitution (Faretta v. California, 422 U.S. 806, 834, 95 S.Ct. 2525, 2540-41, 45 L.Ed.2d 562 (1975)) the right of real persons to appear pro se. To require this corporation to appear by a lawyer is effectively to exclude it and its sole shareholder from the courts."*

In *Victor Co. v. Sleininger,* 255 App. Div. 673 (N.Y. App. Div. 1939), the court made much the same argument, and further asked a question now in front of this Court:

> *"Suppose a corporation were too impoverished to employ a lawyer to defend it, or suppose it had a large claim it believed to be just but could find no lawyer who would take the case, believing it hopeless, should the corporation be denied its day in court?"*

There are numerous other cases where business and other artificial entities did not hire representation, but were able to have their day in court. *Quarrier v. Peabody Ins. Co.* 10 W. Va. 507, held that while a corporation cannot appear in propria persona, it may appear by its president. This Court, in *United States v. Reeves* 431 F.2d 1187 (9th Cir. 1970), reversed a district court's ruling that a partner could not represent a partnership. In *United States v. Burk*, EP-14-CR-240-DCG (W.D. Tex. Jun. 18, 2014), a corporation was appointed representation. In *Fraass Survival Systems v. Absentee Shawnee*, 817 F. Supp. 7 (S.D.N.Y. 1993), an Indian tribal government was permitted to appear pro se.   In reviewing these cases, it is clear that the choice is not necessarily a binary one between buying representation and default; other possibilities are left to the discretion of the Court.

### 6. An old and oft repeated error of law.

In light of all of the above, Petitioner believes that the prohibition of corporate pro se representation is an error of law, and an oft repeated error, which indeed has centuries of precedent behind it. Yet, for the many reasons

aforementioned, Petitioner believes that it is no less an error for all that, and that said precedent has indeed eroded under the weight of those centuries — in light of changing theories of corporate personhood and the rights due those people who make up corporations, in addition to its many other problems. The third and fourth Bauman factors therefore weigh heavily in favor of granting mandamus, and Petitioner respectfully requests the Court address this issue before the error is repeated elsewhere.

**C. The district court's order raises new and important problems or issues of law of first impression**

Upon information and belief, the matter raised in the present Petition raises issues of law of first impression in the Ninth Circuit.

This Court's well-reasoned decision in *United States v. Reeves* is now over 50 years old. Theory has since advanced. Public policy has since shifted. Yet, to Petitioner's surprise, the issues in question here seem to have not risen since, and *Reeves* is furthermore not precisely analogous to the matter at hand.

It may be that, as Alexander Pope once wrote,

> *"Vice is a monster of such frightful mien*
> *As to be hated, needs but to be seen.*
> *But seen too oft, familiar with its face*
> *We first endure, then pity, then embrace."*

With "vice" and "error," which so frequently amount to the same thing, here taken to be interchangeable. In other words, it seems that an error oft

repeated, with such a familiar face, is first endured, is later embraced as case law, and is subsequently challenged only very infrequently if at all.

Must then a corporation that cannot afford representation default? Is justice truly served in such a case, if default functions as "*an admission that the [plaintiff's] cause of action is valid ... and that it has no defense,*" yet if this is, *emphatically*, not the case in reality? If default is simply a sanction for non-compliance with district court rules, Petitioner holds and represents to the Court that it has done nothing worthy of that most severe sanction, save for the fact that its pockets are not quite so deep as plaintiff's, and that it has heretofore been unable to procure counsel. Petitioner has taken unusual measures: Has contacted its congressman, has reached out to the Institute for Justice, has spoken with several "litigation financiers" including prominent Silicon Valley firms e.g. Legalist, yet has nevertheless been unable to secure aid. Petitioner is, however, unbowed and submits that it stands ready and willing to competently answer any complaint laid against it. Petitioner therefore begs the leave of this Court, that it may appear in the proper person of its President and sole shareholder, in its belief that this is the surest way for it to obtain justice, and in its belief that this is the most honorable and dignified course of action available to it. Petitioner, however, will not disdain *any* other relief the Court sees fit to offer. (e.g., special leave to file a dispositive motion with the lower court.)

Ultimately, however, Petitioner begs this Court answer the unresolved and indeed novel question of whether *Osburn v Bank of the United States*

remains good law. Petitioner believes that it does not, and, accordingly, that a writ should issue.

### D. The court should stay proceedings, pending resolution

Petitioner also asks this Court to invoke its authority under the All Writs Act, 28 U.S.C. § 1651, to immediately stay all proceedings while it considers this mandamus petition. See also 9th Cir. General Order 6.8(a) (motions panel "*may also issue a stay or injunction pending further consideration of the application*"). Truly irreparable hardship will otherwise come to Petitioner, who believes that, in favor of a stay, there is a "*a substantial case on the merits and that the balance of hardships tips sharply in the petitioner's favor.*" *Leiva Perez v. Holder,* 640 F.3d 962, 970 (9th Cir. 2011)

### CONCLUSION

For the foregoing reasons, the Court should issue a writ of mandamus directing the district court to grant Petitioner leave to proceed in the proper person of its President and sole shareholder. Petitioner also respectfully requests that this Court issue an emergency stay of all proceedings in the lower court, pending the determination of this Petition and, if the Petition is granted, until such time that the Appeal is decided.

DATED and RESPECTFULLY SUBMITTED this 24th day of May, 2021.

Jake Ganor,
President and Sole Shareholder, Diamond Age Corp.
Pro se on behalf of Petitioner

## ADDENDUM: STATEMENT OF COMPETENCE

Petitioner's sole shareholder and President -- on behalf of Petitioner -- certifies to the Court that he is over 18 years of age, of sound body and mind, and, prior to answering the civil suit that is the basis of this petition, has never before had contact with the criminal or civil courts of this nation. He has had contact with the legal system as an inventor, with several patents to his credit and several pending, many of which were written entirely by his own hand. He has had no help whatsoever in preparing this Petition, and believes himself fully capable of answering any complaint competently. He nevertheless feels keenly the thorny problem on the frontiers of the law that this Petition thrusts upon the Court, and begs the Court's patience and forbearance should he have made any correctable errors, or overstepped any bounds.

Petitioner is a Delaware corporation with a principal place of business in Texas.

Dated: May 24th, 2021

By: _____

Jacob Ganor
1215 S. Kihei Rd. Ste O# 339,
Kihei, Hawaii, 96753
Telephone: 808-359-778
Email: jakeganor@gmail.com
Pro se on behalf of Petitioner.

31

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 21-3 and Circuit Rule 28-2.6, Petitioner states that

there are no related cases pending before this Court.


Dated: May 24th, 2021


By: _____

Jacob Ganor
1215 S. Kihei Rd. Ste O# 339,
Kihei, Hawaii, 96753
Telephone: 808-359-778
Email: jakeganor@gmail.com
Pro se on behalf of Petitioner.

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of May 2021, I have mailed this

document via express courier to the Court Clerk's Office, have mailed it via

express courier to the office of Judge Douglas Rayes, and have e-mailed it to:

Bradley A. Burns, Esq.
*bburns@dickinsonwright.com*
Amanda E. Newman, Esq.
*anewman@dickinsonwright.com*
*Dickinson Wright PLLC*
1850 North Central Avenue, Suite 1400
Phoenix, AZ 85004
*Attorneys for Plaintiff*

Jacob Ganor
Pro se on behalf of Petitioner

33

## CERTIFICATE OF COMPLIANCE WITH PAGE LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

This Petition complies with the page limitations of Ninth Cir. R. 21-2 and 32-3 because this petition is not more than 30 pages, and contains 7,661 words, apart from portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This Petition complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman.  Margins, moreover, are one inch on all sides, and no footnotes were utilized.

Dated:  May 24th, 2021

_____
Jacob Ganor
Pro se on behalf of Petitioner